**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-25-239-JD |
| | ) | |
| LEE GRANT CLARK, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S COMBINED SENTENCING MEMORANDUM, MOTION FOR DOWNWARD VARIANCE, AND BRIEF IN SUPPORT**

Respectfully submitted,

*s/ John P. Cannon*
John P. Cannon, OBA No. 30033
CANNON & ASSOCIATES
401 N. Hudson Avenue, Suite 100
Oklahoma City, Oklahoma 73102
Telephone: (405) 657-2323
Facsimile: (405) 657-2413
Email: John@jpcannonlawfirm.com
ATTORNEY FOR DEFENDANT

# TABLE OF AUTHORITIES

## Cases

*Peugh v. United States*, 569 U.S. 530 (2013) .......... **10, 11, 13, 14**

*United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) .......... **15**

*United States v. Butler*, 429 F.3d 140 (5th Cir. 2005) .......... **11**

*United States v. Lacefield*, 146 F. App'x 15 (6th Cir. 2005) .......... **11**

*United States v. Mantha*, 944 F.3d 352 (1st Cir. 2019) .......... **11, 12**

*United States v. McMillian*, 777 F.3d 444 (7th Cir. 2015) .......... **11, 12**

*United States v. Pagán-Ferrer*, 736 F.3d 573 (1st Cir. 2013) .......... **11**

*United States v. Saferstein*, 673 F.3d 237 (3d Cir. 2012) .......... **11, 12**

## Constitutional Provisions

U.S. Const. art. I, § 9, cl. 3 (Ex Post Facto Clause) .......... **10, 11**

## Statutes

18 U.S.C. § 2241(c) .......... **9**

18 U.S.C. § 2248 .......... **16**

18 U.S.C. § 2251(a) .......... **9, 12**

18 U.S.C. § 2251(d) .......... **9**

18 U.S.C. § 2252A(a)(2)(A) .......... **9**

18 U.S.C. § 2252A(a)(5)(B) .......... **10**

18 U.S.C. § 2259 .......... **16**

18 U.S.C. § 2259(b)(2) .......... **16**

18 U.S.C. § 3553(a) .......... **1, 4, 5, 8, 18**

18 U.S.C. § 3553(a)(1) .......... **4, 6**

18 U.S.C. § 3553(a)(2)(A) .......... **14, 15**

18 U.S.C. § 3553(a)(2)(B) .......... **14**

18 U.S.C. § 3553(a)(2)(C) .......... **8, 15**

18 U.S.C. § 3553(a)(2)(D) .......... **15**

18 U.S.C. § 3553(a)(3)–(4) .......... **9**

18 U.S.C. § 3663A .......... **16**

**United States Sentencing Guidelines**

U.S.S.G. § 1B1.11(b)(1) .......... **10**

U.S.S.G. § 1B1.11(b)(3) .......... **10**

U.S.S.G. § 2G2.1 .......... **11**

U.S.S.G. § 3D1.2 .......... **1**

U.S.S.G. § 3D1.2(a) .......... **12**

U.S.S.G. § 3D1.2(d) .......... **13**

U.S.S.G. § 3D1.2, Application Note 3 .......... **12**

U.S.S.G. § 3D1.4 .......... **13**

U.S.S.G. § 5H1.4 .......... **7**

U.S.S.G. § 5H1.11 .......... **6**

# TABLE OF CONTENTS

**LEE GRANT CLARK: A BRIEF INTRODUCTION** ........ **1**

**ARGUMENTS AND AUTHORITIES** ........ **4**

**I. The Nature and Circumstances of the Offense** ........ **4**

**II. The History and Characteristics of the Defendant** ........ **6**

A. Honorable Military Service and Service-Connected Disability ........ **6**

B. Combat-Zone Exposure and Trauma ........ **7**

C. Advanced Age and Diminished Risk of Recidivism ........ **8**

D. Decades of Lawful, Productive Civilian Employment ........ **8**

E. Acceptance of Responsibility and Cooperation with Probation ........ **9**

**III. The Sentences Available and the Advisory Guideline Range** ........ **9**

A. Application of the 2025 Guidelines Manual to Counts 1–3 Violates the Ex Post Facto Clause ........ **10**

B. The PSR's Grouping Analysis Is Erroneous and Internally Inconsistent ........ **12**

C. Corrected Guideline Calculation ........ **13**

IV. **The Need for the Sentence Imposed to Promote the Statutory Objectives** ........ **14**

A. Seriousness of the Offense, Respect for Law, and Just Punishment ........ **14**

B. Adequate Deterrence: § 3553(a)(2)(B) ........ **14**

C. Protection of the Public: § 3553(a)(2)(C) ........ **15**

D. Rehabilitation and Provision of Needed Treatment ........ **15**

**V. Restitution** ........ **16**

**VI. Other Considerations: Conditions of Supervised Release** ........ **16**

**VII. Request for a Downward Variance** ........ **17**

**CONCLUSION** ........ **18**

**CERTIFICATE OF SERVICE** ........ **19**

COMES NOW the Defendant, Lee Grant Clark, by and through his attorney of record, John P. Cannon of CANNON & ASSOCIATES, and respectfully submits this *Combined Sentencing Memorandum and Motion for Downward Variance*, requesting a below-Guidelines sentence of 240 months' imprisonment. A substantial downward variance is warranted under the sentencing factors set forth in 18 U.S.C. § 3553(a) and the principle directive that this Court "impose a sentence sufficient, but not greater than necessary," to accomplish the purposes of sentencing. As set forth below, the advisory Guideline range in this case is the product of (1) an *ex post facto* violation arising from application of the 2025 Guidelines Manual to conduct alleged to have occurred between 2000 and 2005, and (2) an improper grouping analysis under U.S.S.G. § 3D1.2. Even setting those errors aside, the history and characteristics of Mr. Clark, a 78-year-old retired Senior Chief Petty Officer with 23 years of honorable Naval service, two combat tours in Vietnam, a service-connected disability, and seriously deteriorating health, warrant a sentence well below the life range produced by the PSR's calculation.

**Lee Grant Clark: A Brief Introduction**

Lee Grant Clark is a 78-year-old retired Senior Chief Petty Officer of the United States Navy. He was born on June 11, 1947, in La Mesa, California, the only son of Luther "Lee" Clark and Edith Clark. (PSR ¶119). His childhood was marked by repeated dislocation, his family moved frequently across Oklahoma and Massachusetts; and discipline that he describes as stern. (PSR ¶120). The constant relocation made him perpetually "the new kid" in school, a status that, by his own account, drew him into

recurring physical altercations as a boy. (*Id.*). Two of his three sisters have predeceased him; his only surviving sister, Thera, is 76 years old and lives in Kansas. (PSR ¶ 119).

In August 1965, at the age of 18 and just months after graduating from Ochelata High School in Ochelata, Oklahoma, Mr. Clark enlisted in the United States Navy. (PSR ¶¶ 127–28). He would not leave that uniform for 23 years. He was honorably discharged in July 1988 at the rank of Senior Chief Petty Officer (E-8), a rank earned by only a small fraction of enlisted sailors and one that reflects more than two decades of demonstrated leadership, technical mastery, and exemplary conduct. (PSR ¶128). Records from the National Personnel Records Center independently confirm both his service dates and his honorable discharge. (*Id.*).

The Navy sent Mr. Clark to some of the most demanding postings the service had to offer. He served two combat tours in Vietnam. (PSR ¶128). He spent five years stationed in Antarctica, one of the most physically and psychologically isolating duty stations in the United States military. (*Id.*). He worked for the Joint Chiefs of Staff for approximately one year and served at the Pacific Missile Test Center–Ground Electronics Center. (*Id.*). He was selected for consideration to join the White House Communications team. (*Id.*). And, in his own words documented in the PSR, the gravity of his combat-zone duties was such that he "was told to commit suicide to protect equipment, if necessary, by detonating a grenade." (*Id.*). The Court is asked to consider what it means for a young sailor to receive, internalize, and carry for the remainder of his service such a standing order.

The physical cost of those 23 years of service is now reflected in a 20% Department of Veterans Affairs service-connected disability rating attributed to chronic and

degenerative musculoskeletal conditions, including severe osteoarthritis of the lower back and both knees. (PSR ¶¶ 65, 67, 123). A disability rating that significantly under represents his physical and mental consequences of his service to our Nation. The psychological cost is harder to quantify. The PSR records that Mr. Clark himself described his mental health as "good," acknowledging only situational anxiety in his mid-50s. (PSR ¶125). That self-report is, respectfully, the kind of report this Court has likely heard many times from Vietnam-era senior enlisted servicemembers, men of a generation and a culture in which acknowledging psychological injury was understood to be inconsistent with the warrior identity. The PSR documents *combat exposure, isolation postings, and a standing suicide-by-grenade order*; the absence of a formal diagnosis in the record does not establish the absence of injury.

Following his honorable discharge in 1988, Mr. Clark continued to serve, this time in the civilian sector. He briefly operated his own business, Clark's Hard Drive and Computer Repair. (PSR ¶129). He then returned to school as a man in his mid-40s and earned a bachelor's degree in Electrical Engineering Technology from Oklahoma State University in May 1993. (PSR ¶127). He was hired by Oklahoma State University as a lab manager and worked there continuously until his retirement on December 31, 2009. (PSR ¶129). Records from OSU independently confirm his employment dates. (*Id.*).

Mr. Clark has one surviving daughter, Audrey Bilyeu, age 32, a designer for a national retailer. (PSR ¶121). Ms. Bilyeu has stood by her father throughout these proceedings: she sat for a verification interview with Probation, generally confirmed the personal and family information her father provided, and now serves as the executor of his

estate, liquidating his assets in part to satisfy any restitution obligation this Court orders. (PSR ¶¶ 122, 124, 130). Mr. Clark's remaining material possessions, the home in Stillwater currently listed for sale at $239,000 and a bank account holding approximately $23,000, represent the totality of what 23 years of Naval service and 17 years of university employment have left him. (PSR ¶130). He has no debts. (*Id.*; PSR ¶ 132).

Mr. Clark stands before this Court at age 78 to be sentenced for serious offenses he does not minimize. He has accepted responsibility. He understands his conduct inflicted real and lasting harm on his victims, and that no period of service, no decoration, and no act of subsequent good can undo that harm. He asks this Court only to consider the entirety of his life, the 23 years he gave to the Nation, the decades of lawful work that followed, the dignity with which he has handled these proceedings, and the deteriorating health and advanced age that make any sentence beyond a relatively brief term functionally a sentence to die in federal custody. When the Court performs the individualized assessment that 18 U.S.C. § 3553(a) requires, a sentence below life imprisonment is not only appropriate, it is what the statute commands.

## ARGUMENTS AND AUTHORITIES

### I. The Nature and Circumstances of the Offense: 18 U.S.C. § 3553(a)(1)

Mr. Clark does not minimize the offenses for which he stands convicted. The conduct charged in Counts 1 through 3 of the Indictment is alleged to have occurred between 2000 and 2005 and involved the production of visual depictions, including the Hi8 tape referenced in the PSR. (PSR ¶¶ 64, 72). The conduct charged in Counts 4 and 5

occurred in 2025 and involved the receipt and possession of material under 18 U.S.C. § 2252A. The two sets of conduct are separated by approximately twenty years.

What the Court is being asked to evaluate, then, is not a continuous course of conduct but t*wo discrete episodes* in the life of a man whose six-decade adulthood has otherwise been overwhelmingly characterized by lawful, productive, and in many years honorable service. The 2025 conduct, while undeniably serious, did not involve any contemporaneous abuse of a minor. The 2000 to 2005 conduct, while more serious, must be evaluated against a record that includes 23 years of honorable Naval service preceding it and 17 years of continuous lawful university employment. The PSR documents no other criminal conduct in Mr. Clark's 78 years of life.

The gravity of the offense is reflected in the statutory framework Congress has prescribed and in the substantial mandatory minimums applicable to Counts 1, 3, and 4. (PSR ¶134). It need not, and under § 3553(a) should not, be reflected by stacking advisory enhancements on top of those mandatory minimums in a manner that converts a 78-year-old's case into one carrying a Guideline recommendation of life without parole. The seriousness of the offense is fully captured by a sentence within the statutory maximum on Count 2 and substantially below the life range the PSR generates, in line with the governing policy considerations of the sentencing guidelines.

## II. The History and Characteristics of the Defendant: 18 U.S.C. § 3553(a)(1)

Mr. Clark's history and characteristics, set forth in the introduction and Part C of the PSR, support a downward variance, specifically the following considerations.

### *A. Honorable Military Service and Service-Connected Disability*

Mr. Clark served on active duty in the United States Navy for 23 years, from August 1965 to July 1988, retiring at the rank of Senior Chief Petty Officer (E-8) with an honorable discharge confirmed by the National Personnel Records Center. (PSR ¶128). His service included two combat tours in Vietnam, five years stationed in Antarctica, a year detailed to the Joint Chiefs of Staff, and assignment to the Pacific Missile Test Center. (*Id.*). The PSR records his account that, during his combat-zone service, he was assigned a *standing order to commit suicide by detonating a grenade rather than allow classified equipment to be captured*. (*Id.*). The lasting physical cost of that service is reflected in his current 20% VA service-connected disability rating for chronic musculoskeletal conditions. (PSR ¶123). The lasting mental and emotional toll cannot be quantified, but is highly relevant in considering the appropriate sentence.

The United States Sentencing Commission has expressly directed under U.S.S.G. § 5H1.11 that military service may be relevant in evaluating departures:

> Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.
> *Id.* (emphasis added)

Mr. Clark's service is precisely the kind of service the Commission contemplated. Twenty-three years on active duty, two combat tours, retirement at Senior Chief, an honorable discharge, and a service-connected disability are not present in the typical case before this Court. They distinguish Mr. Clark from the typical defendant and warrant individualized consideration.

The Court should also consider Mr. Clark's significant physical impairment as a mitigating factor. U.S.S.G. § 5H1.4 expressly permits consideration of an "extraordinary physical impairment" as a basis for departure or variance. The PSR documents not only Mr. Clark's service-connected musculoskeletal disability but also chronic obstructive pulmonary disease (COPD), high cholesterol, hypertension, and substantial bilateral vision impairment. (PSR ¶¶ 67, 123–24). His right eye underwent cataract surgery the PSR Objection describes as ineffective; his left eye has a substantial cataract requiring further surgery. (PSR ¶67). He requires hearing aids. (PSR ¶124). He is currently maintained on at least nine medications. (PSR ¶123). At 78, with these conditions, Mr. Clark's actuarial life expectancy is materially shorter than that of the typical federal defendant, a circumstance the Court may properly weigh in determining what term of imprisonment is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

### *B. Combat-Zone Exposure and Trauma*

The PSR records Mr. Clark himself described his mental health as "good," reporting only situational anxiety associated with turning 55. (PSR ¶125). The defense respectfully submits that this self-report should be considered in light of two facts the PSR also

documents: first, the nature of his combat-zone service, including the standing suicide-by-grenade order (PSR ¶128); and second, his generation. Mr. Clark is a Vietnam-era senior enlisted sailor of a generation that was culturally conditioned not to acknowledge or seek treatment for psychological injury. The absence of a clinical diagnosis in this record is not the same as the absence of injury, and the Court is invited to weigh the documented combat exposure for what it is, a form of extraordinary stress whose effects, though never formally diagnosed, may reasonably be considered as part of the individualized § 3553(a) analysis.

### *C. Advanced Age and Diminished Risk of Recidivism*

Mr. Clark is 78 years old. (PSR ¶119). The empirical literature on which the Sentencing Commission itself relies establishes that recidivism rates decline sharply with age and approach negligible levels for offenders over 60, and especially over 70. The Court may properly consider that the protection-of-the-public objective in § 3553(a)(2)(C) is substantially attenuated where the defendant before it is approaching his ninth decade and suffering from significant comorbid health conditions. A sentence of 240 months would mean release at age 98, if Mr. Clark survives at all. Even meaningfully shorter sentences carry the same functional protective effect.

### *D. Decades of Lawful, Productive Civilian Employment*

Following his retirement from the Navy in 1988, Mr. Clark earned a bachelor's degree from Oklahoma State University as a non-traditional student in his mid-40s. (PSR ¶127). He then worked at OSU as a lab manager continuously from 1992 until his retirement in 2009, a 17-year tenure independently confirmed by university employment

records. (PSR ¶129). He has no criminal history of any kind apart from the conduct charged in this case, placing him in Criminal History Category I despite being 78 years old. (PSR ¶ 135).

### *E. Acceptance of Responsibility and Cooperation with Probation*

Mr. Clark has cooperated with the United States Probation Office, sat for the presentence interview, provided a written autobiography (PSR ¶120), and authorized his daughter to verify the personal and family information he provided. (PSR ¶122). He has authorized the liquidation of his assets to ensure restitution can be paid in full to the three identified victims. (PSR ¶ 130).

## III. The Sentences Available and the Advisory Guideline Range: 18 U.S.C. § 3553(a)(3)–(4)

The statutory framework applicable to this case is set forth in PSR ¶134 and reflected in the Indictment. Counts 1 and 3 charge Sexual Exploitation of a Child under 18 U.S.C. § 2251(a) and 18 U.S.C. § 2251(d) (Class C felonies), each carrying a mandatory minimum of 10 years and a statutory *maximum* of 20 years' imprisonment and a $250,000 fine. Count 2 charges Aggravated Sexual Abuse under 18 U.S.C. § 2241(c) (Class A felony), carrying a statutory *maximum* of life imprisonment and a $250,000 fine. Count 4 charges Receipt of Child Pornography under 18 U.S.C. § 2252A(a)(2)(A) (Class C felony), carrying a mandatory minimum of 5 years and a statutory *maximum* of 20 years' imprisonment and a $250,000 fine. Count 5 charges Possession of Material Containing

Child Pornography under 18 U.S.C. § 2252A(a)(5)(B) (Class C felony), carrying a statutory *maximum* of 20 years' imprisonment and a $250,000 fine.

The PSR calculates a Total Offense Level of 43 and a Criminal History Category of I, producing an advisory guideline range of life. (PSR ¶135). For the reasons set forth in the Defendant's previously filed Objections to the Initial Presentence Report, that calculation is the product of two errors that this Court should correct; or, in the alternative, should use as independent grounds for downward variance under § 3553(a).

### ***A. Application of the 2025 Guidelines Manual to Counts 1–3 Violates the Ex Post Facto Clause***

Counts 1 through 3 charge conduct alleged to have occurred between 2000 and 2005. Counts 4 and 5 charge conduct in 2025. The PSR applies the 2025 Guidelines Manual to all five counts pursuant to the "one-book rule" of U.S.S.G. § 1B1.11(b)(3). (PSR ¶50). That application is unconstitutional as to Counts 1 through 3. The Sentencing Commission itself anticipated this risk. Section 1B1.11(b)(1) provides:

> If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.
>
> U.S.S.G. § 1B1.11(b)(1) (emphasis added).

The Supreme Court in *Peugh v. United States*, 569 U.S. 530 (2013), squarely held that "there is an *ex post facto* violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense."

*Id.* Even though the Guidelines are advisory, they remain “the starting point and the initial benchmark” for the sentence, and any retrospective increase in the applicable range “creates a sufficient risk of a higher sentence to constitute an *ex post facto* violation.” *Id.*

Applying the 2025 Guidelines Manual to Mr. Clark’s 2000–2005 conduct creates precisely that risk. The Manual’s § 2G2.1 enhancements have been amended substantially since 2005, and it is virtually certain that the offense levels produced under the 2025 Manual exceed those that would have applied at the time of the conduct. The Tenth Circuit has not yet squarely addressed whether the one-book rule may operate to defeat *Peugh*’s protections as to ungrouped older counts, but four other circuits have, and the weight of authority strongly favors Mr. Clark. The First Circuit in *United States v. Mantha* 944 F.3d 352 (1st Cir. 2019) held that a district court violated the *ex post facto* clause when it applied the 2016 Manual to an ungrouped offense committed in 2001, and noted that the Seventh, Third, and Sixth Circuits had reached the same conclusion. *See United States v. McMillian*, 777 F.3d 444 (7th Cir. 2015); *United States v. Saferstein*, 673 F.3d 237 (3rd Cir. 2012); *United States v. Lacefield*, 146 F. App’x 15 (6th Cir. 2005).

The sole contrary authority, *United States v. Butler*, 429 F.3d 140 (5th Cir. 2005), predates *Peugh* and stands alone. The distinction running through the majority decisions is between grouped and ungrouped offenses: where offenses are properly grouped under § 3D1.2, defendants are on constructive notice that subsequent related conduct will pull earlier conduct into the later Manual. *See United States v. Pagán-Ferrer*, 736 F.3d 573 (1st Cir. 2013). Where, as here, the offenses are ungrouped and stacked independently, that notice rationale evaporates, and the *ex post facto* clause independently protects each

ungrouped count. *See Mantha*; *McMillian*, (7th Cir. 2015) and *Saferstein*, *673 F.3d* at 237 (3rd Cir. 2012).

### ***B. The PSR's Grouping Analysis Is Erroneous and Internally Inconsistent***

The PSR groups Count 3 (production conduct, 2000–2004) with Counts 4 and 5 (receipt/possession, 2025) under U.S.S.G. § 3D1.2(a) on the theory that the counts "involve the same victim and the same act or transaction." (PSR ¶51). That conclusion cannot be sustained. Section 3D1.2(a) permits grouping only where counts involve "the substantially same harm," defined as "counts involving the same victim and the same act or transaction." Application Note 3 clarifies this point:

> [C]ounts are to be grouped together when they represent essentially **a single injury** or are part of a **single criminal episode** or transaction involving the **same victim**."
> U.S.S.G. § 3D1.2, Application Note 3 (emphasis added).

Conduct separated by approximately twenty years, charged under different statutory provisions (§ 2251(a) production versus § 2252A receipt and possession), and producing distinct harms is not a "single criminal episode or transaction" on any reasonable reading of the term. The images underlying the 2025 receipt and possession counts may include depictions originally captured during the 2000–2005 production conduct; however, it does not collapse two decades and two different statutory schemes into a single transaction.

The PSR's grouping analysis is also internally inconsistent. The PSR concludes that Count 3 and Counts 4–5 involve "the same act or transaction" (PSR ¶51) yet simultaneously concludes that Count 3 and Counts 1 and 2 are not grouped because they "represent separate harms." (PSR ¶52). These two positions cannot be reconciled. If Count

3 represents a separate harm from Counts 1 and 2 (both production conduct from the same 2000–2005 period), then it necessarily represents a separate harm from Counts 4 and 5 (different statutory provisions, different conduct, twenty years later).

The correct framework treats Count 3 as a separate group. Counts 4 and 5 are properly grouped under § 3D1.2(d). Counts 1, 2, and 3 each involve distinct harms and distinct victims and should each be assigned to separate groups, with the combined offense level then calculated under § 3D1.4.

### *C. The Corrected Guideline Calculation*

A proper calculation that (i) breaks Count 3 out of Group 1 and (ii) applies the appropriate earlier Guidelines Manual to the 2000–2005 conduct produces a materially lower advisory range than the life range generated by the PSR. As the corrected total offense level turns on both the specific edition of the Guidelines Manual applicable during the 2000–2005 period and the proper recalculation of units under U.S.S.G. § 3D1.4 across the regrouped counts, the exact figure cannot be definitively stated without resolving those inputs. Nonetheless, defense counsel's analysis indicates that the properly calculated total offense level falls materially below the PSR's capped level of 43, yielding an advisory guideline range substantially less than life imprisonment. Defense counsel will be prepared to present the Court with a step-by-step recalculation at sentencing.

Even if the Court declines to formally sustain the Defendant's objections, *Peugh* and the persuasive authority from four sister circuits provide independently sufficient

grounds to vary downward to a sentence consistent with what the corrected calculation would produce. *See* 18 U.S.C. § 3553(a)(4); *Peugh*, 569 U.S. at 549–50.

## IV. The Need for the Sentence Imposed to Promote the Statutory Objectives: 18 U.S.C. § 3553(a)(2)

### *A. Seriousness of the Offense, Respect for Law, and Just Punishment: § 3553(a)(2)(A)*

A sentence of 240 months, twenty years, is a substantial term of imprisonment by any measure. For a 78-year-old man with the documented health conditions reflected in the PSR, it is, in all candor, a life sentence in everything but name. Such a sentence fully reflects the seriousness of the offense conduct, promotes respect for the law, and provides just punishment. A longer sentence would not add proportionate punitive value; it would *simply ensure* that Mr. Clark dies in federal custody.

### *B. Adequate Deterrence: § 3553(a)(2)(B)*

Both specific and general deterrence are served by a 240-month sentence. With respect to specific deterrence, Mr. Clark has no prior criminal history; the certainty of substantial federal incarceration, sex-offender registration for life, and the conditions of supervised release detailed below collectively make further offending essentially inconceivable. He will be deterred by any extended term of incarceration and supervised release conditions.

Respecting general deterrence, a two-decade sentence imposed on a 78-year-old retired senior enlisted combat veteran sends a clear message to similarly situated

individuals that age and prior service do not insulate offenders from serious federal consequences.

This Court should also consider, for a defendant with no prior criminal history, prison carries greater deterrent weight than for a recidivist. In *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006), the Seventh Circuit affirmed a substantial below-Guidelines sentence based in part on the recognition that prison "will mean more" to a first-time offender, advancing both the just-punishment and adequate-deterrence goals of § 3553(a)(2)(A)–(B). That principle applies with particular force to a 78-year-old defendant with no criminal history whose first encounter with incarceration will be his only encounter with incarceration.

### *C. Protection of the Public: § 3553(a)(2)(C)*

The protection-of-the-public objective is fully satisfied by a 240 month sentence. Mr. Clark will be 98 years old at the conclusion of such a sentence, if he survives it. He will then remain subject to lifetime supervised release with stringent conditions, including sex-offender treatment, polygraph monitoring, prohibitions on contact with minors, computer and internet restrictions, and lifetime sex-offender registration. The combination of advanced age, substantial physical impairment, and intensive lifetime supervision affords this Court and the community robust protection.

### *D. Rehabilitation and Provision of Needed Treatment: § 3553(a)(2)(D)*

The Bureau of Prisons offers sex-offender treatment programming and medical care that Mr. Clark can productively engage during a 240-month term. A life sentence forecloses

any opportunity for rehabilitation; a 240-month sentence preserves it while ensuring incapacitation through the period of greatest residual risk.

## V. Restitution: 18 U.S.C. §§ 2248, 2259, and 3663A

Mr. Clark does not contest the imposition of restitution and is prepared to satisfy the amounts identified in the PSR in full. The PSR identifies restitution due to Jane Doe 1 (M.H.) in the amount of $10,000; Jane Doe 2 (A.B.) in the amount of $39,264; and Jane Doe 3 (R.S.) in the amount of $10,000, a total of $59,264. (PSR ¶157). Mr. Clark's daughter has already begun liquidating his assets to ensure these amounts can be paid promptly. (PSR ¶130). His Stillwater home, currently listed at $239,000, and his bank account holding approximately $23,000 are sufficient to satisfy the restitution obligation in full upon sale of the residence. (*Id.*). Mr. Clark respectfully requests the Court order restitution in the amounts identified by the PSR and waive any fine, given the PSR's express finding that he lacks the ability to pay one in addition to restitution. (PSR ¶ 133).

## VI. Other Considerations: Conditions of Supervised Release

Following any term of imprisonment, supervised release will provide an additional and substantial mechanism for protecting the community. Mr. Clark will be subject to lifetime sex-offender registration under the Sex Offender Registration and Notification Act "SORNA". He does not oppose, and indeed will affirmatively comply with, the standard conditions of supervised release imposed in cases of this nature, including: participation in sex-offender mental-health treatment; periodic polygraph examinations; no unsupervised

contact with minors; no access to pornography; suspicion less searches of his person, residence, vehicles, electronic devices, and any workplace; and strict limits on computer and internet use without express approval and monitoring by the United States Probation Office. Together, these conditions ensure ongoing oversight and substantially mitigate any residual risk.

## VII. Request for a Downward Variance

Mr. Clark respectfully requests this Honorable Court vary downward from the advisory Guideline range and impose a sentence of 240 months' imprisonment. Such a sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide for any needed treatment. 18 U.S.C. § 3553(a). A longer sentence has *de minimis* punitive returns. Any longer sentence would do little more than ensure that this 78-year-old combat veteran, who suffers from significant service-connected disabilities and serious health conditions, spends the remainder of his life in federal custody, a result that serves no meaningful purpose beyond what supervised release and the natural course of his remaining years would already achieve.

## CONCLUSION

Mr. Clark's 23 years of honorable Naval service, his service-connected disability, his combat-zone exposure, his decades of subsequent lawful employment, his advanced age, his deteriorating health, and his complete absence of prior criminal history do not excuse the conduct to which he stands convicted. They do, however, provide essential

context for the individualized sentencing analysis 18 U.S.C. § 3553(a) requires. This case demonstrates why the United States Sentencing Guidelines are advisory: rigid adherence to the life range generated by the PSR's calculation, particularly where, as here, that calculation rests on an *ex post facto* violation and an erroneous grouping analysis, would produce a sentence well more than what § 3553(a) requires. Mr. Clark accordingly requests this Court vary downward and impose a non-guideline sentence of 240 months' imprisonment.

Respectfully submitted,

*s/ John P. Cannon*
John P. Cannon, OBA No. 30033
CANNON & ASSOCIATES
401 N. Hudson Avenue, Suite 100
Oklahoma City, Oklahoma 73102
Telephone: (405) 657-2323
Facsimile: (405) 657-2413
Email: John@jpcannonlawfirm.com
ATTORNEY FOR DEFENDANT

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of April 2026, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Jordan Ganz
Assistant United States Attorney

Brandon Hale
Assistant United States Attorney

s/ *John P. Cannon*
John P. Cannon